# United States District Court, Northern District of Illinois

| Name of Assigned Judge or Magistrate Judge | James H. Alesia | Sitting Judge if Other than Assigned Judge | |
|---|---|---|---|
| **CASE NUMBER** | 00 C 4445 | **DATE** | November 1, 2001 |
| **CASE TITLE** | *Cherry Haywood vs. Lucent Technologies, Inc.* | | |

[In the following box (a) indicate the party filing the motion, e.g., plaintiff, defendant, 3rd party plaintiff, and (b) state briefly the nature of the motion being presented.]

**MOTION:**

**DOCKET ENTRY:**

(1) ☐ Filed motion of [ use listing in "Motion" box above.]

(2) ☐ Brief in support of motion due _____.

(3) ☐ Answer brief to motion due_____. Reply to answer brief due_____.

(4) ☐ Ruling/Hearing on _____ set for _____ at _____.

(5) ☐ Status hearing[held/continued to] [set for/re-set for] on _____ set for _____ at _____.

(6) ☐ Pretrial conference[held/continued to] [set for/re-set for] on _____ set for _____ at _____.

(7) ☐ Trial[set for/re-set for] on _____ at _____.

(8) ☐ [Bench/Jury trial] [Hearing] held/continued to _____ at _____.

(9) ☐ This case is dismissed [with/without] prejudice and without costs[by/agreement/pursuant to]
☐ FRCP4(m) ☐ General Rule 21 ☐ FRCP41(a)(1) ☐ FRCP41(a)(2).

(10) ■ [Other docket entry] Enter Memorandum Opinion and Order. The court grants defendant's motion for summary judgment on all counts [34-1]. Final judgment in this case is entered in favor of defendant Lucent Technologies, Inc. and against plaintiff Cherry Haywood. No motions for reconsideration will be entertained.

(11) ■ [For further detail see order attached to the original minute order.]

| | | |
|---|---|---|
| | No notices required, advised in open court. | |
| | No notices required. | number of notices |
| | Notices mailed by judge's staff. | |
| ✓ | Notified counsel by telephone. | NOV 0 2 2001 date docketed |
| ✓ | Docketing to mail notices. | |
| ✓ | Mail AO 450 form. | |
| | Copy to judge/magistrate judge. | date mailed notice |

CW — courtroom deputy's initials

Date/time received in central Clerk's Office — mailing deputy initials

Document Number

# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

CHERRY HAYWOOD,                    )
                                   )
    Plaintiff,                  )
                                   )
    v.                          )    **Case No. 00 C 4445**
                                   )
LUCENT TECHNOLOGIES INC.           )    **Judge James H. Alesia**
                                   )
    Defendant.                  )

DOCKETED
NOV 2 2001

## MEMORANDUM OPINION AND ORDER

Before the court is defendant Lucent Technologies Inc.'s motion for summary judgment pursuant to Federal Rule of Civil Procedure 56(c). For the following reasons, the court grants defendant's motion for summary judgment.

## I. BACKGROUND[1]

Cherry Haywood ("Haywood") brought this suit against Lucent Technologies, Inc. ("Lucent") pursuant to Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq.* ("Title VII"). In Count I, Haywood alleges that Lucent retaliated against her for filing an EEOC claim in February 1999 and discriminated against her because of her race. In Counts II and III, Haywood alleges that Lucent intentionally inflicted emotional distress upon her. In Count IV, Haywood alleges a complaint for slander against Lucent.[2] In order to understand this court's

---

[1]Unless otherwise indicated, the following facts – taken from the parties' Local Rule 56.1 statements – are undisputed.

[2]Haywood initially sued the following four individuals in addition to Lucent: Darlene Scott, Robert Schulman, Richard Bantau, and Spencer Foote. On November 17, 2000, the court

(continued...)

opinion, one must be aware of a number of facts. For the sake of clarity, a recitation of these facts is in four parts. Part A discusses Haywood's employment history in Lucent's Switching and Access Systems ("SAS") organization and her first EEOC claim. Part B discusses Haywood's reassignment to Spencer Foote's Wireless organization and her 1999 mid-year review. Part C discusses Haywood's reassignment into Robert Schulman's[3] application-engineering group and her 1999 year-end review. Part D discusses Haywood's termination, her second EEOC claim, and her current lawsuit.

A.     **Haywood's employment history in the SAS organization and her first EEOC claim**

Lucent hired Haywood on August 26, 1996. In December 1997, Haywood began working as a project manager in the SAS organization and reporting to Steve Smith ("Smith"). Smith's group was part of the AT&T Customer Business Unit, which was headed by Barbara Lax ("Lax"). Haywood's primary responsibility was to develop a plan for Y2K problems with Lucent equipment in AT&T's telephone network. In the spring of 1998, Barbara Wolf ("Wolf") became Haywood's new supervisor.

In July 1998, Wolf gave Haywood a generally unfavorable mid-year performance review. Haywood was told that management was not satisfied and that her performance was not meeting expectations. On July 29, 1998, Haywood and Wolf met with Smith to discuss Haywood's

---

[2](...continued)
dismissed with prejudice Haywood's claims against Scott, Schulman, and Bantau. On February 13, 2001, the court dismissed Haywood's claims against Foote because of insufficient service of process. Accordingly, Count V of the amended complaint, which pleaded a claim of slander against only the individual defendants, has been dismissed.

[3]Throughout the pleadings, the parties sometimes refer to Robert Schulman as Robert Shuman. For the sake of consistency, the court will use the spelling used in plaintiff's amended complaint: Schulman.

performance. During the meeting, Haywood and her managers disagreed about Haywood's performance. Smith stated that he felt Haywood's work product had not met expectations. Haywood stated that she felt her job was not sufficiently defined and that she met all objectives.

In September 1998, Haywood made an internal complaint of race discrimination to Lucent's Equal Opportunity/Affirmative Action Group ("EO/AA Group") because she felt management ignored her. She explained that she thought this treatment was discriminatory because the department was predominantly white and male. Yolanda Escalante ("Escalante"), an employee of Lucent's EO/AA Group, investigated Haywood's complaint and found no evidence of retaliation or harassment based on Haywood's race. Escalante recognized, however, that relations between Haywood and her managers were strained and recommended training on interpersonal relations and management skills for her managers. Escalante also found that management had not adequately defined Haywood's objectives or sufficiently documented their concerns about Haywood's performance. As a result, Escalante recommended that management give Haywood a performance rating of "satisfactory/having met all objectives" for 1998 and that Haywood's managers help her transfer to another department. In accordance with Escalante's recommendation, Haywood received a satisfactory performance rating for 1998.

On February 11, 1999, Haywood filed a charge of discrimination with the United States Equal Employment Opportunity Commission ("EEOC"), alleging that while she was working in Lax's department, she was subjected to adverse treatment based upon her race in that she was excluded from department functions, not acknowledged or communicated with, subjected to constant nitpicking, given an untimely performance review and unclear objectives, and subjected to racially offensive remarks. Haywood also alleged that she was harassed and denied

3

promotional opportunities in retaliation for complaining about race discrimination. On May 28, 1999, the EEOC dismissed Haywood's EEOC charge, finding insufficient evidence to support Haywood's claims.

**B.** **Haywood's reassignment to Spencer Foote's Wireless organization and her 1999 mid-year review**

In the Fall of 1998, after Lucent had rendered its findings on Haywood's internal EO/AA complaint, Haywood contacted Spencer Foote ("Foote"), an African-American who managed a department within Lucent's Wireless organization, to inquire about opportunities in his group. Haywood scheduled a meeting with Foote, but then failed to appear as scheduled.

In December 1998, Haywood again scheduled a meeting with Foote. This time, Haywood appeared. During her meeting with Foote, Haywood informed him that she had filed some type of charge against the SAS organization. Haywood then named as a reference Jim Foster ("Foster"), an African-American manager who had acted as an informal advisor to Haywood.

Foote arranged for Haywood to interview with one of his managers, Fred Krug ("Krug"), who supervised a group called project engineering. During the interview, Krug explained that as a project engineer, Haywood's duties would be similar to those she had performed as a project manager, but that she would be working with engineers to deploy Lucent equipment. In January 1999, Foote offered Haywood a position as a project engineer, and Haywood accepted Foote's offer. Krug gave Haywood and all other project engineers a specific list of nineteen job objectives, and Haywood spent the first two months of 1999 learning about cellular technology by reading and attending classes.

On February 1, 1999, Darlene Scott ("Scott") replaced Krug as manager of the project-engineering group. In March 1999, Scott asked Haywood to assist another employee in preparing a code of conduct for contractors providing services to Lucent. Scott found several deficiencies in Haywood's draft of this document. Haywood informed Scott that she had a contact in Lucent's legal department who would be able to review and approve the completed code of conduct. On April 2, 1999, Scott asked Haywood to attempt to obtain the legal department's approval for the code of conduct. The legal department ultimately declined to approve the document.

In April 1999, Haywood was assigned to work as a project engineer installing a Lucent switch on an AT&T Wireless project in Long Island, New York. One of Haywood's responsibilities on the Long Island project was to participate in regular conference calls between the team of engineers working on the project. Initially, plaintiff was assigned to work with a more experienced project engineer, Darlene Armenta ("Armenta"). Armenta's role was to help Haywood learn the project engineer role and to act as Haywood's mentor. In April 1999, Haywood sent Armenta a lengthy and angry e-mail, attacking her for attempting to usurp Haywood's role as the project engineer on the Long Island project. Haywood sent Scott a copy of this e-mail, and Scott told her it was inappropriate. Later, Haywood sent Armenta an e-mail apologizing for the harsh tone of her previous e-mail and any misrepresentations she made in it.

Around June 19, 1999, the first phase of the installation of the Lucent switch at the AT&T site on Long Island was completed. However, Haywood remained responsible for providing cost-tracking data for the Long Island project to her supervisor, completing her own expense

vouchers, and clearing up a number of issues regarding the reporting of her time for the period from late May 1999 to mid June 1999.

When the time came to conduct mid-year performance reviews for the project engineers, Scott sought advice on how to conduct the reviews from Melinda Jackson Douglas ("Douglas"), an African-American who was the department's human resource manager. Scott met with Douglas, who instructed her to appraise each employee's performance based on his or her stated job objectives and demonstrated performance using a series of behavioral characteristics known within Lucent as the GROWS behaviors.

To carry out her mid-year review of Haywood, Scott used the list of nineteen objectives that Krug previously gave to all project engineers, including Haywood. Scott asked Haywood and each project engineer to submit a list of accomplishments on a Form LT-151. The LT-151 listed each project engineer's nineteen objectives on the left side and provided space on the right side for the employee to state his or her accomplishments. In March 1999, Scott met with the project engineers to discuss the upcoming mid-year review.

On April 23, 1999, Haywood provided a completed Form LT-151 to Scott. Haywood and Scott then met to discuss Haywood's results. Scott gave Haywood the opportunity to revise her Form LT-151 before Scott completed her final mid-year evaluation, but Haywood chose not to revise the form. Based on the information Haywood provided and her own knowledge of Haywood's work, Scott assessed Haywood's performance using the GROWS behaviors as a guide. Scott summarized her assessment on a Form LT-153. Although it contained both positive and negative feedback, the review was critical in a number of areas, including that Haywood (1) did not take personal responsibility for results and usually deflected failure toward others, (2)

6

received feedback on her behaviors and interaction with team members that caused concern, (3) was not proactive in providing information on her project, and (4) met obligations in series sometimes missing deadlines and not always submitting time reports regularly. Subsequently, Haywood and Scott met to discuss her mid-year performance review as reflected on the LT-153.

On June 10, 1999, Haywood met with Foote to explain that she was unhappy with her mid-year review and to assert her belief that the feedback was neither constructive nor specific. Haywood also told Foote that she felt Scott's review was too subjective and personal and disagreed with Scott's criticism that she was not a team player. Foote documented his meeting with Haywood in a June 27, 1999 memorandum, and in response to Haywood's request, Foote scheduled a meeting on June 28, 1999, for Haywood and Foote to meet with Scott and Douglas to discuss problems with Haywood's mid-year review. Foote agreed to work to obtain additional specific examples of Haywood's negative behaviors and to obtain suggestions for more effective behaviors. Foote explained, however, that the performance review process is inherently subjective. In preparation for the meeting, Foote asked Scott to prepare a memorandum giving specific examples of areas where she thought Haywood could improve her performance and to document any performance concerns arising since she had prepared the LT-153.

At the meeting on June 28, 1999, Haywood proceeded first, presenting her objections to the mid-year review and stating her position that Scott had changed her objectives for purposes of the mid-year review. Scott then provided the group with copies of a five-page memorandum describing specific performance problems and supplementing her performance feedback. The memorandum described problems in three areas: commitments, communication, and peer interactions. With respect to commitments, the memorandum described problems Haywood had

in meeting deadlines and expectations, including her failure to provide a timely, complete draft of the code of conduct, to obtain timely legal review as she had promised, and to timely prepare materials for a related presentation. With respect to communication, Scott noted that Haywood failed to provide information about the guidepost project, failed to update her LT-151, and failed to communicate with team members on the Long Island project. With respect to peer interactions, Scott criticized Haywood for her poor handling of communications with Armenta.

Haywood was angry at Scott's presentation, both because she felt that she should have been allowed to review Scott's additional feedback prior to the meeting and because she disagreed with the content of the feedback. She claimed that Scott's presentation was dishonest and defamatory and repeatedly interrupted Scott as she tried to present the contents of her memorandum to the group. Haywood disagreed with the suggestion that she was not a team player and felt that feedback was too subjective and personal. She further claimed that Scott was blowing disputes between Haywood and Armenta out of proportion and favoring certain peers by highlighting their accomplishments. Haywood also thought the criteria used to judge her performance had not been previously disclosed and that the feedback she had received would be detrimental to her pursuit of other opportunities in the future. Douglas brought the meeting to a close when it was clear it had ceased to be productive. Haywood promised to prepare a rebuttal document to contest Scott's criticisms of her performance, but she never provided that document to her managers.

**C.** **Haywood's reassignment into Robert Schulman's application-engineering group and her 1999 year-end review**

In late June or early July 1999, Lucent decided to disband the project-engineering group and allow project engineers to find work in any of the groups within Foote's Wireless organization. At that time, Haywood met with Robert Schulman ("Schulman"), a manager in Foote's department to discuss her career options. Based upon Haywood's description of her skills, experiences, and interests, Schulman advised Haywood to join the applications-engineering group.

In July 1999, Haywood had several conversations with Foote in which she inquired about options for employment both inside and outside Foote's group. Foote investigated the possibility of transferring Haywood to another group, supervised by Foster, who had previously acted as Haywood's advisor and reference. Foster said he would speak to Haywood about the possibility of moving into his group. Foote placed Haywood's reassignment on hold while he contacted Foster about transferring Haywood to his department. Foote learned from either Haywood or Foster that Haywood did not wish to move into Foster's department. Haywood contends she was never advised by Foote or Foster of a job in Foster's department.

When Haywood ultimately told management that she wanted to move into Schulman's group, Foote and Schulman met to discuss Haywood. Foote explained Haywood's concerns regarding her mid-year review and asked Schulman to consider bringing Haywood into his group. Schulman told Foote that he wanted to talk with Haywood first. After learning that Haywood wanted to join his group, Schulman delayed her transfer for about a week at the end of July because he wanted to meet with Haywood and make sure she understood that she would

9

be reporting to Schulman for the two remaining months of the performance year and that much of her year-end review would be based upon work she had done in her prior organization.

Meanwhile, Haywood left a voicemail for Douglas in which she asked Douglas to look into the delay in the approval of her transfer from Scott's group to Schulman's group. Douglas forwarded the voicemail to Foote, Scott, and Schulman. Schulman felt that the tone and content of most of the voicemail was inappropriate, particularly Haywood's unfounded assumption that someone was delaying her transfer.

In the first week of August 1999, Haywood began working in Schulman's group. From the time the project-engineering group was disbanded until the time she joined Schulman's group, Haywood continued to receive her regular salary and benefits. In addition, Haywood continued to work on several assignments connected with the Long Island project. These included completing and processing her expense vouchers and gathering cost-tracking data for the Long Island project. When Haywood transferred into Schulman's group, he did not know that she had filed an EEOC charge relating to her alleged treatment in Lax's SAS department. He first learned that Haywood had filed such a charge when Haywood filed this lawsuit.

In Schulman's applications-engineering group, Haywood was responsible for understanding the technology she would be working with and was assigned to head a team called "Costbusters" that was devoted to reducing expenses for Foote's entire organization. In addition, Haywood had the general administrative responsibilities of any other employee, including preparing time sheets, submitting vouchers, and reconciling expenses.

Within Foote's organization at Lucent, the year-end review process consisted of several steps. First, a manager would solicit information from the employee regarding his or her

accomplishments during the year. Then the manager would prepare a written review of the employee. Next, the management team consisting of Foote and several managers, would meet to jointly review all employees. During that meeting, each employee would be assigned a performance band from one to six, with one being the best and six being the worst. Foote's organization did not use forced banding, where a specified number of employees were placed in each band so that the banding distribution fit a bell curve. In 1999, all employees in Foote's organization who were in Band 5 or Band 6 were to be placed on performance improvement plans, following a discussion with the employee about his or her performance. Band 6 employees were slated for termination due to poor performance.

Consistent with departmental practice, Schulman prepared a year-end review of Haywood's performance. He gathered information from Haywood's prior managers, including Scott, as well as peers and managers who worked with Haywood on the Long Island project but who did not directly supervise Haywood. Many of the people Schulman contacted were ones Haywood herself had suggested he contact. Scott gave Schulman a prepared description of Haywood's performance while under her supervision. In his evaluation, Schulman did not take into account any performance problems Haywood had in Lax's organization, even though Haywood was in Lax's organization for part of the performance year. Based on his observations of Haywood's performance and the feedback he received, Schulman rated Haywood a "5."

On November 17, 1999, Schulman met with Haywood in Haywood's office to discuss her year-end review. Schulman had intended the meeting to be short and simply to give Haywood the review so that she could have time to review it prior to a formal performance review meeting later that week. Instead, the meeting lasted approximately half an hour.

Haywood rejected Schulman's offer to meet regarding the review, responding that "there's nothing that I need to discuss with respect to this document." Haywood then sent an e-mail describing the meeting to Schulman, Foote, Scott, Douglas, and her lawyer. Haywood stated in the e-mail that she had refused to acknowledge receipt of the performance review by signing it because she invoked her "right not to sign a document in which I do not agree with its contents." After Haywood received her year-end review from Schulman but prior to December 2, Foote, Schulman, and Douglas scheduled a December 7 meeting with the company's legal counsel, James M. Staulcup, Jr. ("Staulcup"), to discuss appropriate steps to take regarding Haywood's job performance.

On December 2, 1999, Haywood came to Schulman's office to discuss the status of an e-mail alias Schulman had asked Haywood to create for the Costbusters team. Haywood and Schulman have different recollections of the events in Schulman's office.

According to Haywood, Schulman told her he felt she had not put in the aggressive work he expected. When Haywood responded that she didn't understand, Schulman got agitated and said, "Cherry, I think you don't understand how much stress and pressure I am under here." To that, Haywood responded, "Well, Bob, you know, I really feel sorry for a person who allows their moral values and ethics to be compromised if that is how you feel." Schulman then told her to "get the hell out of his office." She said, "Excuse me?" He said he wanted her out of his office, and she was getting his "dander up." Her hand was on the door and she said, "I just wanted to let you know that the e-mail alias was completed." He told her he didn't want to ever meet with her again without a third person present, even though he was her direct manager, and

he told her again to get out of his office. At that point, Schulman rose from his chair, came over to where she was standing, took hold of her elbow, and literally pushed her out of his doorway.

According to Schulman, Haywood was upset that he had questioned whether she was working on the e-mail alias and that he had asked for specific reasons why such a simple project was not completed. Haywood then made reference to a discussion she claimed to have had with him in November. Schulman did not remember that conversation, and Haywood told him that his problem was that he "didn't recall a lot of stuff when it was convenient" for him to forget things. Haywood then began to berate Schulman, stating that he may have been her supervisor but she did not respect him. She asked him if he thought he was God. The discussion continued until Schulman told Haywood that the discussion was not productive. Schulman then told Haywood that he wanted to have a third party present at any further discussions because he was concerned that Haywood might misrepresent what he said in private meetings. He then asked Haywood to leave his office, but she did not. Rather, she stood her ground, stuck her finger in his face, escalated her tone, and stood toe to toe with him. He asked her again to leave his office, at which point he escalated the tone of his voice. He stood up, opened the door to his office, pointed to it, and asked her to leave.

Following the incident in his office, Schulman sent a memorandum to Foote with a copy to Haywood documenting the events as he saw them. Haywood responded by sending her own version of the events. Foote received and reviewed both versions of the incident. Then, on Monday, December 6, 1999, Foote sent Haywood an e-mail, stating: "After reviewing both your account and Bob Schulman's, it is clear that there is disagreement in portrayal of the facts of this incident and/or the interpretation of events. As such, it is obvious that it is neither a positive nor

13

productive environment for all parties." Foote instructed Haywood and Schulman to avoid one-on-one contact until further notice.

**D.    Haywood's termination, her second EEOC claim and her current lawsuit**

On December 7, two working days after the December 2, 1999 incident in Schulman's office, Foote, Schulman, Douglas, and Staulcup met as scheduled to discuss appropriate steps to take regarding Haywood's job performance. At the meeting, Foote decided to terminate Haywood's employment. Foote explained that he did not feel the decision was sudden because Haywood had received feedback on her inappropriate conduct over a period of time and had failed to act on that feedback. Although Schulman was Haywood's direct supervisor at the time, Foote made the final decision to terminate Haywood because he was the one that was originally approached by Haywood for an opportunity, and he felt a degree of responsibility for her representation in the organization. Schulman supported Haywood's termination because he felt she had lied about the events in his office on December 2, 1999, and her refusal to leave his office constituted insubordination.

After unsuccessful attempts to meet with Haywood on December 7 and 10, Foote sent Haywood a letter informing her of the decision to terminate her employment. Foote's letter explained that Haywood had been terminated for three reasons: (1) Haywood did not display the ability to accept and/or act upon constructive feedback; (2) Haywood did not display the ability to establish a viable working relationship with management; and (3) Haywood had a pattern of insubordinate behavior.

On January 10, 2000, Haywood filed a second EEOC charge. This charge alleged race discrimination and retaliation. In particular, the charge alleged that Haywood was not given

objectives, was denied productive work assignments, was subject to verbal harassment and threats, was prevented from moving into another work group, and was ultimately terminated based upon her race and the fact that she had filed a prior EEOC charge. Haywood's second EEOC charge does not allege sex discrimination. On April 25, 2000, the EEOC issued Haywood a right to sue letter.

On July 21, 2000, Haywood filed the instant lawsuit. Haywood alleges four claims against Lucent: (1) retaliation in violation of Title VII, (2) race discrimination in violation of Title VII, (3) intentional infliction of emotional distress under Illinois law, and (4) defamation under Illinois law.

Haywood bases her belief that she was the victim of race discrimination and retaliation upon various comments she claims Foote made to her and others at Lucent. Foote denies making any of these comments. In particular, Haywood claims that in mid-June 1999, Foote told Haywood he was tired of helping African-American women because all they do is complain about the slightest little thing. She also claims that Foote said to her on unspecified occasions that "the problem with black women is that all you do is either complain or you are going to leave." (Haywood Dep. 223.)

Haywood also claims that other employees told her about similar comments that Foote had made to them in the summer of 1999. First, Haywood claims that Sheila Manear ("Manear") told her that Foote had said that he was tired of "you all" coming in here complaining and that he specified that by "you all" he meant black women. Second, Haywood claims that Manear told her on another occasion that Foote said, "you should be happy that you still have a job because one more black woman being here is not going to hurt." (Haywood Dep. 225.) Third, Haywood

claims that Vera Williams ("Williams") told her that Foote had said "he wasn't going to help any more of you black women because you always have a complaint." (*Id.*) Fourth, Haywood claims that Marlene Barclay ("Barclay") told her that Foote had denied her a recommendation and said, "I put my neck out for too many black women, and I have gotten it chopped off" and then explained that he thought black women were too confrontational. Finally, Haywood claims that Irvine Fox ("Fox") told her that Foote had said that she "should be careful with regard to the company you keep because you never know who is watching you. As a black woman it's already more difficult of a challenge to help you, but if you are keeping bad company that will certainly not help you." (*Id.* at 228.) Again, Foote denies making any of these comments.

The facts surrounding Haywood's slander claim are also in dispute. Haywood alleges that after terminating Haywood, Scott, Schulman, and Foote verbally notified the security staff and other employees that she had been terminated and that she was unstable, and that they further ordered the security staff to contact the police if Haywood's car appeared in the parking lot within the next two years and that she was to be immediately arrested thereafter. Haywood claims she learned of these statements from Jacqueline McKinley ("McKinley"), a security guard at Lucent. Haywood alleges that McKinley told her that she received information from security to alert Naperville police and contact security if Haywood was ever seen on the premises of Lucent Technologies or Indian Hill West because Haywood was deemed unstable. Haywood alleges further that McKinley told her Foote had called to make sure that some notification was issued to security with regard to Haywood's termination. Haywood also claims that Foster had told her that Foote had told him that Haywood had been terminated and that "it should have happened before that time" and that "I feel that I did what I had to do." Scott, Schulman and

Foote contend they never contacted Lucent security regarding Haywood's termination or informed security that Haywood should be arrested if she appeared at Lucent's Naperville facility.

This court has subject-matter jurisdiction over Haywood's claims of retaliation and race discrimination pursuant to 42 U.S.C. § 2000e-5(f)(3). The court has jurisdiction over Haywood's state law claims pursuant to 28 U.S.C. § 1367. This matter is currently before the court on Lucent's motion for summary judgment on all of Haywood's claims.

## II. DISCUSSION

### A. Standard for deciding a motion for summary judgment

A motion for summary judgment is proper "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." FED. R. CIV. P. 56(c). A genuine issue of material fact exists for trial when, in viewing the record and all reasonable inferences drawn therefrom in a light most favorable to the non-moving party, a reasonable jury could return a verdict for the non-movant. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248 (1986); *Smith v. Severn,* 129 F.3d 419, 425 (7th Cir. 1997).

The burden is on the moving party to show that no genuine issues of material fact exist. *Celotex Corp. v. Catrett,* 477 U.S. 317, 322 (1986); *Anderson,* 477 U.S. at 256. Once the moving party presents a prima facie showing that it is entitled to judgment as a matter of law, the non-moving party may not rest upon the mere allegations or denials in its pleadings but must set forth specific facts showing that a genuine issue for trial exists. *Celotex,* 477 U.S. at 324;

*Anderson,* 477 U.S. at 256-57; *Schroeder v. Lufthansa German Airlines,* 875 F.2d 613, 620 (7th Cir. 1989).

**B.    Count I – Title VII claims of retaliation and race discrimination**

In Count I, Haywood alleges that Lucent (1) retaliated against her for filing a charge of discrimination in February 1999 and (2) terminated her employment because of her race.

**1.    Retaliation Claim**

In Count I, Haywood alleges that Lucent retaliated against her for filing an EEOC charge in February 1999 by (a) delaying her transfer from Scott's project-engineering group to Schulman's application-engineering group in July 1999 and (b) ultimately terminating her employment in December 1999. Retaliation claims are analyzed under a variant of the *McDonnell Douglas* burden-shifting method. To establish a prima facie case of retaliation, Haywood must show that: (1) she engaged in statutorily-protected expression; (2) she suffered an adverse employment action; and (3) there is a causal link between the protected expression and the adverse employment action. *Eiland v. Trinity Hosp.*, 150 F.3d 747, 753 (7th Cir. 1998). Once Haywood establishes her prima facie case, Lucent has the burden of producing a valid, non-retaliatory reason for its action. *See Sanchez v. Henderson*, 188 F.3d 740, 746 (7th Cir. 1999). In order to prevail, Haywood must then rebut Lucent's proffered reason by establishing that it is merely pretextual. *Id.*

Lucent does not address the first element of Haywood's prima facie case; thus, the court will assume that Haywood has established that she engaged in a statutorily protected activity. However, Lucent argues that Haywood has failed to established the second and third elements of her prima facie case because (a) any alleged delay in transferring her to another department

18

in July 1999 does not constitute an adverse employment action, and (b) Haywood cannot establish a causal connection between her February 1999 EEOC charge and either the alleged transfer delay in July 1999 or her employment termination in December 1999. As discussed below, the court finds that Haywood has failed to establish the third element of her prima facie case, the required causal link between the adverse employment action and the protected activity. Because the court finds that Haywood has failed to establish the third element of her prima facie case, the court need not address the second element of her prima facie case, whether Haywood has sufficiently alleged that she suffered from an adverse employment action.

To demonstrate the causal link, a plaintiff must show that the defendant would not have taken the adverse action "but for" the protected behavior. *McKenzie v. Ill. Dept. of Transp.*, 92 F.3d 473, 483 (7th Cir. 1996). A plaintiff can establish the causal link by showing that there was a suspiciously short period of time between her complaint and the adverse employment action. *Parkins v. Civil Constructors of Ill., Inc.*, 163 F.3d 1027, 1039 (7th Cir. 1998). As the time period between the two events increases, the hint of a causal link decreases. *Davidson v. Midelfort Clinic, Ltd.*, 133 F.3d 499, 511 (7th Cir. 1998) (citing *McClendon v. Ind. Sugars, Inc.*, 108 F.3d 789, 796-97 (7th Cir. 1997)). The Seventh Circuit recently stated,

> In retaliation cases, time is often an important evidentiary ally of the plaintiff. When an adverse employment action follows close on the heels of protected expression, and the plaintiff can show that the person who decided to impose the adverse action knew of the protected conduct, the causation element of the *prima facie* case is typically satisfied. ... [H]owever, it works the other way, too. As the time separating the protected conduct and the adverse employment action grows, the causal inference weakens and eventually time becomes the plaintiff's enemy.

*Lalvani v. Cook County*, No. 00-1603, 2001 WL 1230782, at *4 (7th Cir. Oct. 15, 2001) (internal citations omitted).

In this case, Haywood does not present any direct evidence of a "but for" causal connection between her EEOC charge and either employment action. Further, Haywood has not shown that a suspiciously short period of time passed between her EEOC complaint and the adverse employment action. Haywood filed her EEOC charge in February 1999. The alleged transfer delay did not occur until July 1999, and Lucent did not terminate her employment until December 1999. This five to ten month time period is not sufficient to establish a causal link. *See Filipovic v. K & R Express Sys., Inc.*, 176 F.3d 390, 398 (7th Cir. 1999) (finding that four months negates causal inference); *Parkins*, 163 F.3d at 1039 (finding no causal inference when three months passed between the protected activity and the adverse employment action); *Davidson*, 133 F.3d at 511 (finding no causal inference where employee was terminated five months after filing EEOC complaint).

The court acknowledges that temporal proximity is only evidence of causation, not a separate element of the prima facie case, and that in some cases a plaintiff can demonstrate causation despite a substantial time lag. *See Lalvani*, 2001 WL 1230782, at *5. Here, however, Haywood offers no evidence to show that Lucent would not have taken the adverse action "but for" her protected behavior, so she has failed to demonstrate a causal connection. Thus, Haywood has failed to establish the third element of a prima facie case of retaliation.

Furthermore, even if Haywood had established her prima facie case, she has failed to establish that Lucent's proffered nondiscriminatory, legitimate reason for the adverse employment actions, *see* Part II.B.2.b.i, was pretextual, *see* Part II.B.2.b.ii. Thus, the court finds that Lucent is entitled to judgment as a matter of law on this claim. Accordingly, the court grants Lucent's motion for summary judgment on Haywood's Count I retaliation claim.

## 2. **Discrimination Claim**

In Count I, Haywood also alleges that Lucent discriminated against her by assigning and evaluating her work, delaying her transfer in July 1999 and terminating her employment in December 1999 because of her race. Title VII makes it "an unlawful employment practice for an employer ... to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion," or sex. 42 U.S.C. § 2000e-2(a)(1). Under Title VII, discrimination may be established in either of two ways – through direct evidence or through the indirect burden-shifting method set forth in *McDonnell Douglas Corp. v. Greene*, 411 U.S. 792 (1973). *See McCarthy v. Kemper Life Ins. Cos.,* 924 F.2d 683, 686 (7th Cir. 1991).

### a. **Direct or "mixed motives" method**

Haywood contends that the evidence in this case is sufficient to utilize the "direct evidence" proof structure discussed above, while Lucent counters that the case should proceed only under the burden-shifting method identified in *McDonnell Douglas.* In this case, Haywood presents various racial slurs Foote allegedly made to her and others. She also argues that there is direct proof of discrimination because Foote's decision to terminate her on the bases of performance and insubordination was discriminatory and her disagreements with management about her reviews became a pretext for termination. For the reasons discussed below, Haywood's arguments regarding direct evidence fail.

### i.    Direct evidence

Assuming that Foote made these racial slurs, they do not constitute direct evidence of discrimination. Direct evidence is "'evidence which if believed by the trier of fact, will prove the particular fact in question without reliance on inference or presumption.'" *Cowan v. Glenbrook Sec. Serv. Inc.*, 123 F.3d 438, 443 (7th Cir. 1997) (quoting *Plair v. E.J. Brach & Sons, Inc.*, 105 F.3d 343, 347 (7th Cir. 1997)). Evidence qualifies as "direct" evidence when it "in and of itself suggests that the person or persons with the power to hire, fire, promote, and demote the plaintiff were animated by an illegal employment criterion." *Venters v. City of Delphi*, 123 F.3d 956, 972 (7th Cir. 1997). For a plaintiff to successfully establish direct evidence of discriminatory intent, it "essentially requires an admission by the decision maker that his actions were based on the prohibited animus," and these admissions are "rarely found." *Radue v. Kimberly-Clark Corp.*, 219 F.3d 612, 616 (7th Cir. 2000).

Such evidence "'must not only speak directly to the issue of discriminatory intent, it must also relate to the specific employment decision in question.'" *Cowan*, 123 F.3d at 443 (quoting *Randle v. LaSalle Telecomms., Inc.*, 876 F.2d 563, 569 (7th Cir. 1989)). Seemingly stray remarks can qualify as direct evidence only if they were "'related to the employment decision in question.'" *Fuka v. Consumer Elecs.*, 82 F.3d 1397, 1403 (7th Cir. 1996) (quoting *McCarthy*, 924 F.2d at 686-87). To be probative of discrimination, "isolated comments must be contemporaneous with the [employment decision] or causally related to the ... decision making process." *Geier v. Medtronic, Inc.*, 99 F.3d 238, 242 (7th Cir. 1996). If no connection is established, the remarks are insufficient by themselves to give rise to an inference of discrimination "even when uttered by the ultimate decisionmaker." *Fuka*, 82 F.3d at 1403.

Here, Haywood claims that in a conversation in mid-June 1999, Foote told her he was tired of helping African-American women because all they do is complain about the slightest little thing. She also claims that Foote said to her on unspecified occasions that "the problem with black women is that all you do is either complain or you are going to leave." (Haywood Dep. 223.) Further, Haywood claims that other employees told her about similar comments Foote made to them in the summer of 1999. Foote denies making any of these comments.

Assuming Foote made these comments, they do not constitute direct evidence of a discriminatory motivation. Haywood presents no argument or evidence that these derogatory comments, although made by Foote, the decision maker, were expressed contemporaneously with or in reference to the employment action in question. Therefore, they do not constitute direct evidence of discriminatory intent.[4]

Second, Haywood fails to establish direct evidence of discrimination through her claim that her disagreements with management about her reviews became a pretext for termination. Again, direct evidence is "evidence which if believed ... will prove the particular fact in question without reliance on inference or presumption." *Walker v. Glickman*, 241 F.3d 884, 888 (7th Cir. 2001) (internal quotation marks and citation omitted). Here, direct evidence would be what Lucent's employees said or did in the specific employment decision in question. *See Plair*, 105

---

[4]The court is mindful of the fact that it denied Lucent's motion *in limine* to exclude these comments as stray remarks and reserved ruling until trial whether such comments were admissible. The court is not now excluding these comments. Rather, it simply finds that these comments do not constitute direct evidence of discrimination. As the Seventh Circuit recently clarified, "evidence of inappropriate remarks not shown to be directly related to the employment decision may not support a direct-method-of-proof case, but, in connection with other evidence, might support a case under *McDonnell Douglas*." *Gorence v. Eagle Food Ctrs., Inc.*, 242 F.3d 759, 762 (7th Cir. 2001).

F.3d at 347. Haywood does not contend that Foote ever said he was delaying Haywood's transfer or terminating her employment because she was black. Therefore, a trier of fact could not conclude that Haywood's termination was the result of racial discrimination without adopting certain inferences and presumptions. Because Haywood's arguments do not prove without inference that Lucent discriminated based on her race, Haywood has not presented direct evidence of discrimination. *See Plair*, 105 F.3d at 347. Thus, Haywood must meet her burden with circumstantial evidence.

### ii.    Circumstantial evidence

Under the direct approach, the Seventh Circuit has held that a plaintiff can build "direct" evidence from a mosaic of circumstantial evidence which may show that employer's decision was motivated by an impermissible purpose. *Troupe v. May Dept. Stores Co.*, 20 F.3d 734, 736 (7th Cir. 1994); *see also Pafford v. Herman*, 148 F.3d 658, 665 (7th Cir. 1998). Circumstantial evidence, if sufficiently persuasive, may defeat a motion for summary judgment on a Title VII claim. *Troupe*, 20 F.3d at 736. The "mosaic of evidence" under *Troupe* can consist of many different kinds of evidence none conclusive in itself. However, a plaintiff must allege enough of them to satisfy this factor. *Bickerstaff v. Nordstrom, Inc.*, 48 F. Supp. 2d 790, 797 (N.D. Ill. 1999). In *Troupe*, the court stated that there are three types of circumstantial evidence upon which a plaintiff can rely in order to avoid the *McDonnell Douglas* burden-shifting method: (1) evidence consisting of suspicious timing, ambiguous statements, oral or written, behavior directed toward or comments directed at other employees in the protected group, and other bits and pieces from which an inference of discriminatory intent might be drawn; (2) evidence, whether or not rigorously statistical, that similarly-situated employees who were not in the

protected group received systematically better treatment; and (3) evidence that "the plaintiff was qualified for the job in question but passed over in favor of (or replaced by) a person not having the forbidden characteristic and that the employer's stated reason for the difference in treatment is unworthy of belief, a mere pretext for discrimination." *Troupe*, 20 F.3d at 736.[5] In order to avoid summary judgment, Haywood must produce evidence from which a rational trier of fact could reasonably infer that Lucent made the adverse employment decisions because of her race. *Marshall v. Am. Hosp. Ass'n*, 157 F.3d 520, 525 (7th Cir. 1998).

---

[5] As this court noted in *Demick v. City of Joliet*, 135 F. Supp. 2d 921, 933 n.5 (N.D. Ill. 2001), several courts have limited or criticized *Troupe*'s expansive definition of circumstantial evidence. *See Cowan*, 123 F.3d at 443-44 (holding that direct evidence cannot rely on inference or presumption but must directly prove that an employer's actions were motivated by racial animus – although not citing *Troupe*); *Schaffner v. Rush Presbyterian St. Luke's Hosp.*, No. 94 C 2471, 1996 WL 507246, at *5 n.8 (N.D. Ill. Sept. 4, 1996) (finding that, because the definition of circumstantial evidence improperly incorporates the indirect method and because the court did not believe the Seventh Circuit intended to eliminate the indirect method under *McDonnell Douglas*, the third type of circumstantial evidence should be analyzed under the burden-shifting method). *See also Huff v. UARCO*, 122 F.3d 374, 380 (7th Cir. 1997) (holding that the standard of proving pretext is the same under *Troupe* and *McDonnell Douglas*); *Robin v. Espo Eng'g Corp.*, 200 F.3d 1081, 1089 (7th Cir. 2000) (finding that whether "the evidence presented is characterized as 'indirect' evidence or 'mosaic' evidence, very often the best way to evaluate the plaintiff's case at the summary judgment stage is 'to use the *McDonnell Douglas* steps'..."); *Jones v. City of Elgin*, No. 96 C 6920, 1998 WL 259538, at *7-8 (N.D. Ill. May 13, 1998) (adopting the reasoning of *Schaffner* and analyzing plaintiff's evidence under *McDonnell Douglas*). This court agrees with the holdings in *Huff* and *Schaffner* that circumstantial evidence regarding the pretextual nature of an employer's reasoning is more appropriately analyzed under *McDonnell Douglas*. Further, this court also notes that the idea of using circumstantial evidence – which by its very nature requires a finder-of-fact to make inferences and presumptions – to directly establish discrimination seems oxymoronic. However, other recent Seventh Circuit cases have upheld *Troupe* and applied that standard. *See Bell v. EPA*, 232 F.3d 546, 553-54 (7th Cir. 2000) (applying the *Troupe* standard and considering circumstantial evidence); *Council 31, Am. Fed'n of State, County & Mun. Employees v. Doherty*, 169 F.3d 1068, 1072-73 (7th Cir. 1999); *Pafford*, 148 F.3d at 665. Thus, despite the inconsistencies and confusion among the courts, this court must accept the standard set forth in *Troupe* as good law.

The only potential *Troupe* argument Haywood makes involves the first type of circumstantial evidence: behavior directed toward or comments directed at other employees in the protected group. Haywood alleges that Foote made various racial slurs to her and other African-American women. Foote denies making any of these comments.

Even assuming Foote did make these statements, these statements do not constitute circumstantial evidence sufficient to defeat a summary judgment motion. Ambiguous statements, for purposes of showing discrimination by circumstantial evidence, refer to "isolated comments" supporting an inference of discrimination that were made *contemporaneously* with the adverse employment decision. *Gorence*, 242 F.3d at 762; *Marshall*, 157 F.3d at 526. As the Seventh Circuit recently clarified, "bigotry, per se, is not actionable. It is actionable only if it results in injury to a plaintiff; there must be a real link between the bigotry and an adverse employment action." *Gorence*, 242 F.3d at 762 (citing *Miller v. Am. Family Mut. Ins. Co.*, 203 F.3d 997 (7th Cir. 2000)). A derogatory or bigoted comment fails to show discrimination unless it is related to the employment decision. *Id.* Such a comment constitutes direct evidence of discrimination only if "the decision makers themselves, or those who provide input into the decision, express such feelings (1) around the time of, *and* (2) in reference to, the adverse employment action complained of." *Gorence*, 242 F.3d at 762 (emphasis added) (citing *Hunt v. City of Markham*, 219 F.3d 649, 652 (7th Cir. 2000)).

Here, none of Foote's alleged racial slurs were made contemporaneously with any adverse employment decision. Therefore, none of these alleged statements indicate Lucent was terminating her employment because of her race. *See Marshall*, 157 F.3d at 526 (stating that, under the direct proof method as outlined in *Troupe*, isolated comments must be

contemporaneous with or causally related to the adverse employment action in order to be probative of discrimination); *Accurso v. United Airlines, Inc.*, 109 F. Supp. 2d 953, 959 (N.D. Ill. 2000) (finding plaintiff provided no circumstantial evidence when statements did not indicate defendant was suspending plaintiff because of her race and not her misconduct). Further, Haywood has not demonstrated a causal connection between the comments and Lucent's decision to terminate her employment.[6]

In sum, Haywood has presented neither direct nor circumstantial evidence sufficient to allow a fact-finder to reasonably infer that Lucent's actions were motivated by discriminatory intent. Thus, Haywood has failed to prove her discrimination claim under the direct method. Therefore, because there is no direct evidence of discrimination, the court will examine Haywood's case under the *McDonnell Douglas* burden-shifting method.

### b. <u>Burden-shifting method</u>

Under *McDonnell Douglas*, a plaintiff must first establish, by a preponderance of the evidence, a prima facie case of employment discrimination. *McDonnell Douglas*, 411 U.S. at 802. If the plaintiff establishes a prima facie case, then "the burden of production shifts to the employer to articulate a legitimate, nondiscriminatory reason for its allegedly biased employment decision." *Johnson v. City of Fort Wayne, Ind.,* 91 F.3d 922, 931 (7th Cir. 1996). If the employer meets its burden, then the plaintiff must show, by a preponderance of the evidence, that the employer's stated reason for dismissal is nothing more than pretext. *Id.*

---

[6]Even if Haywood presented these derogatory remarks under the indirect proof method, "remarks unrelated to the employment decision in question may not overcome summary judgment if they stand alone as evidence of the employer's discriminatory intent." *Marshall*, 157 F.3d at 526 (quoting *Huff*, 122 F.3d at 385).

### i. Haywood's prima facie case

To establish a prima facie case of employment discrimination, Haywood must show that: (1) she belong to a protected group; (2) she performed satisfactorily; (3) her employer subjected her to an adverse employment action; and (4) similarly-situated employees outside her classification received more favorable treatment. *Hughes v. Brown*, 20 F.3d 745, 746 (7th Cir. 1994). Neither party addresses the first element of Haywood's prima facie case. Lucent, however, contends that Haywood has failed to establish elements two, three and four of her prima facie case.

A plaintiff can establish the second element of the prima facie case through her own testimony that her performance was satisfactory. *Weihaupt v. Am. Med. Ass'n,* 874 F.2d 419, 428 (7th Cir. 1989). Her performance must have been satisfactory at the time of her alleged termination – not just at some time during her employment. *Hong v. Children's Mem'l Hosp.,* 993 F.2d 1257, 1262 (7th Cir. 1993). In July 1998, Haywood received unfavorable reviews from Wolf and Smith. Also, in April 1999, Haywood received a negative review from Scott. Further, on November 17, 1999, just before Haywood's employment was terminated, Schulman met with Haywood to discuss her year-end review in which he rated her a "5." Haywood does not dispute that she received these unfavorable reviews or the rating of "5" just before her employment was terminated, nor does she contend that her performance was satisfactory. Rather, Haywood merely claims that Lucent failed to follow its express policies and procedures with respect to work assignments and performance reviews. She also claims that the feedback she received was not constructive or specific, that her review was too subjective and personal, that her performance objectives were changed, and that her evaluation criteria was not previously

28

disclosed. At most, Haywood claims that a performance level of "5" did not mandate termination. This again is mere criticism of Lucent's evaluation criteria. In stark contrast, Haywood never demonstrates – or even asserts – that her performance was satisfactory at the time of the adverse employment actions.

Thus, Haywood has failed to establish that she performed satisfactorily. By not establishing element two of the prima facie case, Haywood has failed to meet her burden of establishing a prima facie case of discrimination, and the court need not address elements three and four of her prima facie case.

### ii. Legitimate nondiscriminatory reasons

Furthermore, even if Haywood established her prima facie case, Lucent has established a legitimate, nondiscriminatory reason for allegedly delaying her transfer and terminating her employment. As for the alleged delay in transfer, Lucent asserts that Foote placed Haywood's reassignment on hold while he contacted Foster about transferring Haywood to his department, and that Schulman delayed her transfer for about a week because he wanted first to meet with Haywood. Lucent also articulates several legitimate, nondiscriminatory reasons for Haywood's termination. It asserts that Haywood (1) was unable to establish a working relationship with her supervisors, (2) was unable to accept or act upon constructive feedback, and (3) was insubordinate. The undisputed evidence provides clear factual support for Lucent's asserted legitimate nondiscriminatory reasons. As the Seventh Circuit has stated, the court will "not sit as a super-personnel department that reexamines an entity's business decisions." *Debs v. Northeastern Ill. Univ.*, 153 F.3d 390, 396 (7th Cir. 1998). Thus, Lucent has articulated a legitimate, nondiscriminatory reason for the adverse employment actions.

### iii. Pretext

Because Lucent has established a legitimate, nondiscriminatory reason for its decisions, Haywood must show that the proffered reason is pretextual. In order to do so, Haywood must "*specifically* refute the facts which allegedly support the employer's proffered reasons." *Mills v. First Fed. Sav. & Loan Ass'n*, 83 F.3d 833, 845 (7th Cir. 1996) (citation omitted) (emphasis in original). Further, to demonstrate pretext, Haywood "must show more than that the employer's decision was incorrect; [Haywood] must also show the employer lied about its proffered explanation." *Johnson*, 260 F.3d at 732 (internal quotations omitted). *See also Alexander v. Wis. Dept. of Health & Family Serv.*, 263 F.3d 673, 683 (7th Cir. 2001) ("[W]hen reviewing a grant of summary judgment, the only question before us is whether the plaintiff has provided evidence from which a rational trier of fact could infer that the employer's stated reasons for taking the adverse action were lies."); *Tincher v. Wal-Mart Stores, Inc.*, 118 F.3d 1125, 1130 (7th Cir. 1997) ("The mere fact that the employer acted incorrectly or undesirably ... cannot adequately demonstrate pretext."); *Anderson v. Baxter Healthcare Corp.*, 13 F.3d 1120, 1124 (7th Cir. 1994) (stating that plaintiff must "produce evidence from which a rational factfinder could infer that the company lied").[7]

---

[7]In assessing whether Haywood can show pretext, the court also recognizes two facts that present a strong inference of nondiscrimination. First, Foote hired Haywood into his organization and also fired her. *See Ritter v. Hill 'N Dale Farm, Inc.*, 231 F.3d 1039, 1044 (7th Cir. 2000) (finding an inference of nondiscrimination can be made from the fact that plaintiff was hired and fired by the same individual). Second, Foote and Haywood are both African-American. *See Rooks v. Girl Scouts of Chicago*, No. 95 C 206, 1995 WL 562126, at *7 (N.D. Ill. Sept. 21, 1995) (stating that if the decision maker is in the same protected class as the plaintiff, claims of discrimination become less plausible). Although the inference of nondiscrimination is rebuttable, *see Roberts v. Separators, Inc.*, 172 F.3d 448, 452 (7th Cir. (continued...)

To show that the proffered nondiscriminatory reason is pretextual, Haywood must show one of the following: (1) Lucent's explanation of the adverse employment action had no basis in fact, or (2) the explanation was not the "real" reason, or (3) the reason stated was insufficient to warrant the allegedly discriminatory action. *Id.* Thus, Haywood's burden is to show that Lucent lied when it stated that Foote placed Haywood's reassignment on hold while he contacted Foster about transferring Haywood to his department and that Schulman delayed her transfer because he wanted to meet with Haywood first. Further, Haywood must show Lucent lied when it stated that it believed Haywood (1) was unable to establish a working relationship with her supervisors, (2) was unable to accept or act upon constructive feedback, and (3) was insubordinate. *See Velasco v. Ill. Dep't of Human Servs.,* 246 F.3d 1010, 1017 (7th Cir. 2001) (stating that a plaintiff cannot withstand summary judgment if she fails to create a triable issue of fact with respect to each of her employer's legitimate reasons).

Rather than showing that Lucent is lying about its proffered explanation, Haywood attempts to show pretext by criticizing Lucent's evaluation process and claiming that Lucent failed to follow its own express policies and procedures with respect to work assignments and performance reviews. However, in discussing the nature of the pretext inquiry, the Seventh Circuit has stated "that it is not enough for a plaintiff to show that [her] employer's explanation was based on an inaccurate assessment of its employee's performance." *Olsen v. Marshall & Ilsley Corp.,* 00-3840, 2001 WL 1117297, at *4 (7th Cir. Sept. 25, 2001) (citing cases). Rather,

---

[7](...continued)
1999), Haywood's evidence does nothing to undercut Lucent's stated reasons for the adverse employment actions, *see* Part II.B.2.b.i, because she fails to create an issue of fact on the question of pretext, *see* Part II.B.2.b.ii.

evidence that shows that an employer incorrectly assessed its employee's abilities does not shed light on whether the employer is lying about that assessment. And without proof of a lie, no inference of discriminatory motive can be drawn. ... An employee's perception of [her] own performance ... cannot tell a reasonable factfinder something about what the employer believed about the employee's abilities.

*Id.* (internal citations omitted).

It is well-established that an employer is free to develop its own criteria in making business decisions, and it is not the court's place to evaluate the wisdom of those decisions. *See Johnson*, 260 F.3d at 733. The law requires only that an employer honestly believed its reason for its actions, even if its reason was foolish, trivial or baseless. *Id.* The court's only concern at the pretext stage is whether the employer honestly remained dissatisfied with its employee's performance. *Olsen*, at *3. Here, Haywood does not challenge the supported fact that Lucent was honestly dissatisfied with Haywood's performance. Further, Haywood has offered no evidence that the employment actions she challenges were motivated by her race or complaints of discrimination rather than by Lucent's legitimate belief that such actions were justified by her conduct. Thus, Haywood has not presented any evidence that would cause a reasonable factfinder to question whether Lucent honestly believed its assessment. Therefore, Haywood has failed to establish that Lucent's proffered reasons are mere pretext.

In sum, Haywood has failed to establish her prima facie case and has failed to show that Lucent's proffered reasons were pretextual. Thus, the court finds that Lucent is entitled to judgment as a matter of law on this claim. Accordingly, the court grants Lucent's motion for summary judgment on Haywood's Count I discrimination claim.

## C.     Illinois state law claims

Because Haywood's federal claims do not survive summary judgment, the court can only reach the merits of Haywood's state law claims if supplemental jurisdiction under 28 U.S.C. § 1367 is proper. "When all federal claims are dismissed before trial, the court should generally relinquish jurisdiction over pendent state-law claims." *Kennedy v. Schoenberg, Fisher & Newman, Ltd.*, 140 F.3d 716, 727 (7th Cir. 1998). However, "if an 'obviously correct' interpretation of state law 'knocks out the plaintiff's state law claim ... the federal judge should put the plaintiff out of his misery then and there, rather than burdening the state courts with a frivolous case.'" *Murphy v. Vill. of Hoffman Estates*, No. 95 C 5192, 1999 WL 160305, at *11 (N.D. Ill. Mar. 17, 1999) (quoting *Van Arken v. City of Chicago*, 103 F.3d 1346, 1354 (7th Cir. 1997)). In this particular case, because this court can easily address and "knock out" Haywood's state law claims, the court will do so.

### 1.     Counts II and III - Intentional infliction of emotional distress claim

In Counts II and III, Haywood alleges a complaint for intentional infliction of emotional distress ("IIED"). Haywood admits that her IIED claims are based on the same alleged conduct that underlies her Title VII claim. (Pl.'s Resp. to Def.'s 56.1 Statement ¶ 85). Lucent argues that Haywood's IIED claim is preempted by the Illinois Human Rights Act ("IHRA"), 775 ILL. COMP. STAT. 5/8-111(C), and, even if it were not preempted, the claim would fail on the merits because Haywood cannot establish the elements of IIED.

Lucent is correct that Haywood's IIED claim is preempted by the IHRA. The IHRA was enacted to create a state cause of action for various civil rights violations amounting to discrimination based on race, sex, handicap, religion, age, unfavorable military discharge, marital

status, and other factors. *Luckett v. Jett,* 966 F.2d 209, 211 (7th Cir. 1992). The IHRA preempts state law tort claims when the facts alleged are "inextricably linked" to civil rights violations. *Geise v. Phoenix Co. of Chicago, Inc.,* 639 N.E.2d 1273, 1277 (Ill.1994). *Accord Maksimovic v. Tsogalis,* 687 N.E.2d 21, 22 (Ill.1997). Haywood concedes that her IIED claim is based on the same conduct underlying her discrimination claim; therefore, her IIED claim clearly is "inextricably linked" to her federal claims, and it is preempted by the IHRA. *See Rai v. Dynagear, Inc.,* No. 98 C 6053, 2000 WL 875401, *12-14 (N.D. Ill. June 26, 2000) (finding claims inextricably linked). *Accord Westphal v. City of Chicago,* 8 F. Supp. 2d 809, 812 (N.D. Ill. 1998); *Ratley v. City of Aurora,* No. 97 C 3422, 1998 WL 30697, at *3 (Jan. 22, 1998).

Thus, because Haywood's IIED claim is preempted by the IHRA, the court lacks jurisdiction over that claim and needs not address the merits of the claim. Accordingly, the court grants Lucent's motion for summary judgment on Haywood's Counts II and III IIED claims.

## 2.  Count IV – Slander

In Count IV, Haywood claims that Lucent is liable for slander because, following her termination, Scott, Schulman, and Foote (1) verbally notified security staff and other employees that Haywood had been terminated, (2) verbally notified security staff and other employees that Haywood was unstable, and (3) ordered the security staff to contact the police if Haywood's car appeared in the parking lot within the next two years and that she was to be immediately arrested thereafter. Haywood learned of these statements from McKinley, a security guard at Lucent. Scott, Schulman and Foote deny making any of these statements.

Unlike the IIED claims, the slander claim is not inextricably linked to Haywood's discrimination claims, so it is not preempted by the IHRA. Nonetheless, Haywood has not established a claim for slander. The Illinois law of slander and defamation is well-settled:

> Defamation, which includes slander and libel, has been defined as words that reflect critically upon one's integrity in her business or profession, and as a statement tending to cause harm to the reputation of another in that it lowers that person in the community's eyes or deters third persons from associating with that person.

*Knoll Pharm. Co. v. Auto. Ins. Co. of Hartford*, 152 F. Supp. 2d 1026, 1037-38 (N.D. Ill. 2001) (citing *Crinkley v. Dow Jones & Co.*, 385 N.E.2d 714, 720 (1978) and *Bryson v. News Am. Publ'n, Inc.*, 672 N.E.2d 1207, 1215 (1996)). A corporate defendant is jointly and severably liable for defamatory statements actionable against its employee when the employee is acting within the scope of his employment. *Chisholm v. Foothill Capital Corp.*, 3 F. Supp. 2d 925, 938 (1998).

To prove defamation under Illinois law, a plaintiff must show (1) the defendant made a false statement about the plaintiff, (2) there was an unprivileged publication to a third party with fault by the defendant, and (3) the publication damaged the plaintiff. *Parker v. House O'Lite Corp.*, No. 1-00-3764, 2001 WL 968418, at *3 (Ill. App. Ct. Aug. 22, 2001) (citing *Vickers v. Abbott Labs.*, 719 N.E.2d 1101, 1101 (Ill. App. Ct. 1999)). Four categories of statements are considered defamatory *per se*: (1) words that impute the commission of a criminal offense; (2) words that impute infection with a loathsome communicable disease; (3) words that impute an inability to perform or want of integrity in the discharge of duties of office or employment; and

(4) words that prejudice a party, or impute a lack of ability, in his or her trade, profession, or business. *Wynne v. Loyola Univ. of Chicago*, 741 N.E.2d 669, 675 (Ill. App. Ct. 2000).

Assuming *arguendo* that these individuals did make these statements, the alleged statements are defamatory *per se* under the third and fourth categories set forth above. However, as explained below, each of the alleged statements are not actionable as a matter of law because they are either (a) substantially true, (b) pure opinion, or (c) entitled to qualified privilege.

### a.    <u>Substantial truth regarding the termination of Haywood's employment</u>

First, assuming Scott, Schulman or Foote did verbally notify security staff and other employees that Haywood had been terminated, this statement was true, so Haywood's defamation claim based on this statement fails.

One who publishes a defamatory statement of fact is not subject to liability for defamation if the statement is true. *Wynne*, 741 N.E.2d at 675. Further, only "substantial truth" is required for this defense. *Id.* Although substantial truth is normally a question for the jury, where no reasonable jury could find that substantial truth had not been established, the question is one of law. *Id.* at 676 (citing *Hollymatic Corp. v. Daniels Food Equip.*, 39 F. Supp. 2d 1115 (N.D. Ill. 1999)). Haywood admits the fact that her employment was terminated. Therefore, no reasonable jury could find that the substantial truth of the statement that she was terminated has not been established. Thus, because the alleged statement is "substantially true," her defamation claim based on this statement fails.

**b.** **Pure opinion regarding Haywood's "instability"**

Second, assuming Scott, Schulman or Foote did verbally notify security staff and other employees that Haywood was "unstable," this is "pure opinion," so Haywood's defamation claim based on this statement fails also.

The distinction between fact and opinion is a matter of law. *Bogosian v. Bd. Of Educ. of Cmty. Unit Sch. Dist. 200*, 134 F. Supp. 2d 952, 957 (N.D. Ill. 2001) (citing *Owen v. Carr*, 497 N.E.2d 1145, 1148 (1986)). Although all opinions imply facts, the question of whether a statement of opinion is actionable as defamation is one of degree; the vaguer and more generalized the opinion, the more likely the opinion is non-actionable as a matter of law. *Wynne*, 741 N.E.2d at 676 (citing *Hopewell v. Vitullo*, 701 N.E.2d 99, 105 (1998)). The test for determining the actionability of an allegedly defamatory statement of opinion rests upon whether the statement contains an objectively verifiable assertion. *Id.*

Here, the assertion that Haywood was "unstable," is not objectively verifiable and therefore not actionable. *See Wynne*, 741 N.E.2d at 676 (finding vague and incapable of verification statements that the plaintiff made bizarre telephone calls to other colleagues regarding her infertility injections, and that she began striking various deals with the dean); *Bogosian*, 134 F. Supp. 2d at 957 (finding teacher's statement that plaintiff's behavior was "unprofessional," standing alone, could be construed as a statement of opinion); *Kryeski v. Schott Glass Techs., Inc.*, 626 A.2d 595, 601 (Pa. 1993) (finding non-actionable a statement that plaintiff was "crazy and unstable"). Although the statement of Haywood's instability could conceivably be verified by some psychological evidence, neither party has produced any evidence to suggest that it is verifiable, so the statement is non-actionable opinion. *See id.*

(finding teacher's statement that plaintiff had a need to touch female students was non-actionable opinion even though it could conceivably be verified by some psychological evidence). Thus, because the alleged statement is "pure opinion," Haywood's defamation claim based on this statement fails.

### c. Qualified privilege regarding Haywood's exclusion from Lucent premises

Third, assuming Scott, Schulman or Foote did order the security staff to contact the police if Haywood's car appeared in the parking lot within the next two years and that she was to be immediately arrested thereafter, Lucent is entitled to qualified privilege for making this statement, even if it was false, so Haywood's defamation claim based on this statement fails.[8]

An otherwise defamatory statement is not actionable if made under a qualified privilege. *Anglin v. Sears Roebuck & Co.*, No. 93 C 3438, 1998 WL 483524, at *7 (N.D. Ill. Aug. 10, 1998). The existence of qualified privilege is a question of law. *Bogosian*, 134 F. Supp. 2d at 958. Statements made within a legitimate business context may be protected by a qualified privilege, including a statement made from employer to employee. *Anglin,* 1998 WL 483524, at *7. Illinois law establishes three classes of qualified privilege: (1) situations in which some interest of the person who publishes the defamatory matter is involved; (2) situations in which some interest of the person to whom the matter is published or of some other third person is

---

[8]The court recognizes that this statement might also be non-actionable because it is substantially true. However, this statement is objectively verifiable, and Lucent fails to set forth any evidence supporting its truth, such as evidence that Haywood was precluded from the premises in accordance with an established Lucent policy precluding former employees from the premises. Therefore, a reasonable jury could find that the substantial truth of this statement has not been established. Accordingly, the court evaluates this statement, assuming it might be false, under qualified privilege.

involved and (3) situations in which a recognized interest of the public is concerned. *Parker*, 2001 WL 968418, at *8 (citing *Kuwik v. Starmark Star Mktg. & Admin., Inc.*, 619 N.E.2d 129 (1993)). A court must determine as a matter of law and general policy whether the occasion created a recognized duty or interest that makes the communication privileged. *Id.* The inquiry is a general one, requiring the court to weigh the value of the type of interest to be protected against the degree of damage to be expected from release of the type of defamatory matter involved. *Id.* at *9.

Here, the communication that security staff contact the police if Haywood appeared on the premises is subject to a qualified or conditional privilege because Lucent, the security guards, and third party employees have a compelling interest -- even a duty -- in knowing whether Haywood was no longer employed by the company and no longer allowed on the premises. *See Kuwik*, 619 N.E.2d 129 (finding that the defendant insurance company and third party patients had a compelling interest in knowing whether plaintiff chiropractor was acting within the scope of her license). Because the alleged communication was made on an occasion where not only the interests of Lucent were involved, but where security guards' and other employees' interests were involved as well, "a misstatement of information should be afforded some degree of protection in order to facilitate the free flow of correct information." *Id.* Therefore, the alleged communications were conditionally privileged.

Once a defendant has established a qualified privilege, a communication is actionable only if the plaintiff can show the defendant abused the privilege. *Parker*, 2001 WL 968418, at *8. To satisfy this burden, the plaintiff must present evidence of a "reckless act which shows a disregard for the defamed party's rights, including the failure to properly investigate the truth

of the matter, limit the scope of the material, or send the material to only the proper parties."
*Kuwik*, 619 N.E.2d at 136. The issue of whether a privilege was abused ordinarily is question
of fact. *Vickers*, 719 N.E.2d at 1110. However, the plaintiff must come forward with actual
evidence creating an issue of fact. *Cianci v. Pettibone Corp.*, 698 N.E.2d 674, 680 (Ill. App. Ct.
1998). Further, when determining whether factual issues exist for purposes of a summary
judgment motion, the court "must ignore personal conclusions, opinions and self-serving
statements and consider only facts admissible in evidence." *Parker*, 2001 WL 968418, at *10
(citations omitted).

Here, Haywood asserts that these individuals "knowingly and intentionally made these
false publications of statement in order to cause Haywood's reputation to be damaged." (Am.
Comp. ¶ 23.) However, other than this conclusion, Haywood asserts no actual evidence that the
individuals failed to properly investigate the truth of the matter, limit the scope of the material,
or send the material only to the proper parties. To the contrary, the alleged statements were
made to the proper parties in the context of a professional situation that necessarily called for
awareness that her employment was terminated and that she was no longer allowed on the
premises. Therefore, Haywood has failed to create a triable issue of fact with respect to whether
Lucent abused the conditional privilege which protects the communication. *See Anglin*, 1998
WL 483524, at *8 ("[A]buse of a qualified privilege cannot simply be asserted to defeat a motion
for summary judgment. Plaintiff has the burden to provide sufficient evidence to create a
genuine issue of material fact; absent such evidence, summary judgment is appropriate.").

In sum, the undisputed facts fail to demonstrate that the alleged statements constitute
actionable slander. Thus, the court finds that Lucent is entitled to judgment as a matter of law

on this claim.  Accordingly, the court grants Lucent's motion for summary judgment on Haywood's Count IV slander claim.

## III. <u>CONCLUSION</u>

For the foregoing reasons, the court grants Lucent's motion for summary judgment on all counts.  Final judgment in this case is entered in favor of defendant Lucent Technologies Inc. and against plaintiff Cherry Haywood.

Date: **NOV 0 1 2001**

Judge James H. Alesia
United States District Court